**FEDERAL PUBLIC DEFENDER**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **RICHARD COUGHLIN**<br>FEDERAL PUBLIC DEFENDER | 1002 Broad Street<br>Newark, New Jersey 07102 | **CHESTER M. KELLER**<br>FIRST ASSISTANT |

(973) 645-6347  Telephone
(973) 645-3101  Facsimile

December 18, 2020

Honorable Edward S. Kiel
United States Magistrate Judge
U.S. Post Office & Federal Courthouse
Two Federal Square
Newark, NJ  07102

    Re:    <u>In the Matter of the Extradition of Parthasarthie Kapoor, Mag. No. 20-15012 (ESK)</u>

Dear Judge Kiel:

Please accept this letter brief in lieu of a more formal brief in opposition to the Government's brief of extradition law dated April 20, 2020, submitted in the above-captioned case.  The person before the Court – whose true name is Perth De -- challenges extradition to Canada on the grounds that he is not the person being sought by Canada and the Government does not present sufficient evidence to establish probable cause that he was involved in the crimes alleged against him in Canada.  For the reasons set forth below, Mr. De asks that Your Honor make a recommendation to the Secretary of State, in a manner consistent with 18 U.S.C. § 3184, that probable cause is lacking to support the charges.

**I.**    **Background**

On February 5, 2003, the United States District Court for the District of Columbia issued a warrant for the provisional arrest of Parathasarthie Kapoor at the request of Canada, pursuant to the Extradition Treaty between the United States of America and Canada.

Canada seeks to extradite Mr. Kapoor on charges that are nearly 20 years old.

The person identified as Mr. Kapoor is, as further discussed below, an individual named

---

Perth De.  Mr. De immigrated to the United States from India and became a naturalized U.S. citizen in 2010, after becoming a permanent resident in July 2002.  He has been living in the United States working at Intercruises Shoreside & Port Services as a Part Time Pier Agent, since 2016.  He previously worked for a number of years as a polling inspector for the New York City Board of Elections, and has also worked at Duane Reade, Burlington Coat Factory, Burger King, Wendy's, and Sears.  Mr. De has paid taxes for nearly two decades since 2001.  He married his spouse in 2016, and they reside together in New York.  He adamantly denies the allegations lodged against him.

With its extradition complaint, the Government provides two exhibits; Exhibit 1 contains the Affidavit of Law from the Director of Criminal and Penal Prosecutions of Quebec, and the Affidavit of Fact from Detective Pascal Fortier.  The Affidavit of Detective Fortier provides the alleged facts that form the basis of the charges.

Mr. De vehemently denies any role in the alleged charges.  Importantly, he has not been tried or convicted on these charges.  Regarding the extradition complaint, Mr. De challenges the extradition because he respectfully submits that he is not the person identified in the Government's extradition request and that the Government, and by extension Canada, does not have sufficient and reliable evidence establishing probable cause.

**II.     Legal Standard**

Extradition is *sui generis* in nature; it is considered neither civil nor criminal.  See, e.g., *In re Extradition of Kirby*, 106 F.23d 855, 867 (9th Cir. 1996).  Different from a criminal proceeding, an extradition hearing is considered "administrative in character" and is governed by statute and treaty.  *Id*.; *see* 18 U.S.C. §§ 3181-84.  Initially, this matter is largely controlled by the United States-Canada Extradition Treaty.  Dec. 3, 1971, 27 U.S.T. 983.  Thus, the Executive

branch controls many aspects of the extradition process. *See Sidali v. I.N.S.*, 107 F.3d 191, 194 (3d Cir. 1997) (discussing the President's power to conduct foreign affairs); *Hoxha v. Levi*, 465 F.3d 554, 560 (3d Cir. 2006). The Constitution and federal law limit the judiciary's role in an extradition hearing. *See id*. (analyzing 18 U.S.C. §§ 3181-95 and Article II of the Constitution). Nevertheless, courts perform an important function that guards the rights of the accused, protecting that individual from an arbitrary and baseless extradition. *See* 18 U.S.C. § 3184 (instructing that a court must determine if there is "evidence sufficient to sustain the charge"). Notably, the extradition treaty provides:

> Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused had been committed in its territory or to prove that he is the identical person convicted by the courts of the requesting State.

Treaty on Extradition, U.S.-Can., art. 10(1) Dec. 3, 1971, 27 U.S.T. 983 (emphasis added). Therefore, it is the role of this Court to determine if "probable cause supports the charges." *Hashbarger v. Regan*, 599 F.3d 290, 292 (3d Cir. 2010). Mr. De submits that the government offers insufficient evidence to establish probable cause for extradition under the treaty.

Pursuant to 18 U.S.C. § 3184 and the Extradition Treaty between the United States and Canada, a federal court may only order extradition if (1) the Court possesses subject matter jurisdiction, (2) the Court has personal jurisdiction over the defendant, (3) the person before the Court is the person identified or named in the Government's extradition request, (4) a valid treaty exists, (5) that treaty covers the alleged crime(s), and (6) the Government offers competent evidence that supports a finding of probable cause for the crime accused. *See In re Extradition of Harshbarger*, 600 F. Supp. 2d 636, 641-42 (M.D. Pa. 2009) (citing *In re Ortiz*, 444 F. Supp. 2d 876, 881-82 (N.D. Ill. 2006)). In this case, Mr. De challenges extradition because he

contends that he is not the person identified in the Government's extradition request, and that the Government's evidence is insufficient to constitute probable cause.

Under 18 U.S.C. § 3184 and the Treaty, probable cause must be established by the Government in accordance with principles of United States law, where the basic standard has been defined as "evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *Republic of France v. Moghadam*, 617 F. Supp. 777, 784 (N.D. Cal. 1985); *see, e.g.*, *United States v. Soyland*, 3 F.3d 1312 (9th Cir. 1993); *United States v. Butts*, 704 F.2d 701, 703 (3d Cir. 1981); *see also Sidali*, 107 F.3d at 199 (stating that to determine if the evidence supports a finding of probable cause, the court will apply the same standard used in federal preliminary hearings). In this regard, it should be warned that "[t]he harsh results of an erroneous extradition based on untrustworthy accusations [militate] against [a] Court applying too lenient a standard of review in determining probable cause." 617 F. Supp. at 784. Furthermore, as the *Butts* court indicated, probable cause cannot be established by mere presence at the crime scene or opportunity to commit the crime. Instead, there must be a "link" or causal connection between the defendant and the criminal activity to establish probable cause under American law. *See Soyland*, *supra*. Mere conclusory allegations do not satisfy the probable cause standard. *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1365 (S.D. Fla. 1999); *In re Garcia*, 188 F. Supp. 2d 921, 932 (N.D. Ill. 2002).

A finding of probable cause must be well-grounded in facts. *See In re Extradition of Bolanos*, 594 F. Supp. 2d 515, 520 (D.N.J. 2009) (emphasizing the important of facts to corroborate allegations); *see also United States v. Peterka*, 307 F. Supp. 2d 1344, 1350 (M.D. Fla. 2003) (denying extradition where the evidence did not amount to probable cause because "[an individual's] stated suspicion . . . has little probative value without supporting facts.").

When considering whether the evidence presented constitutes probable cause, the court should remember that the structure and rules of an extradition hearing puts the individual facing extradition at a severe disadvantage.  First, the accused may not generally seek discovery.  *See Matter of Extradition of Singh*, 123 F.R.D. 108, 111 (D.N.J. 1987).  Also, an individual facing extradition may only introduce limited evidence.  *See Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006) (distinguishing between the admissible "explanatory evidence" and the inadmissible "contradictory evidence").  Discussing the limited evidence that a person facing extradition may present, the Third Circuit explained,

> Courts have traditionally distinguished between inadmissible "contradictory evidence," which merely conflicts with the government's evidence, and admissible "explanatory evidence," which entirely eliminates probable cause. *See, e.g.*, *Barapind v. Enomoto*, 360 F.3d 1061, 1069 (9th Cir. 2004) ("The general rule is that evidence that explains away or completely obliterates probable cause is admissible, while evidence that merely controverts the existence of probable cause is not.") (internal quotation marks omitted); *Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991) ("Although it is within the discretion of the district court to permit the relator to offer limited, explanatory evidence relating to the charges against him, contradictory evidence properly may be excluded.") (citations omitted).  In practice, this line is not easily drawn, but the rule serves the useful purpose of allowing the defendant "to present reasonably clear-cut proof . . . of limited scope [that has] some reasonable chance of negating a showing of probable cause," while preventing the extradition proceedings from becoming "a dress rehearsal trial." *Koskotas*, 931 F.2d at 175 (internal quotation marks omitted).

*Hoxha*, 465 F.3d at 561.  The inability to introduce most evidence is not the only structural disadvantage that the accused faces.

In contrast to the significant limitations placed on the party challenging extradition, there are few restrictions on what evidence the Government may introduce on behalf of the nation seeking to extradite the individual.  Notably, the Federal Rules of Criminal Procedure and the Federal Rules of Evidence do not normally apply in an extradition hearing, including the prohibition against hearsay and the authentication requirements for records and reports.  *See*

*Bolanos*, 594 F. Supp. 2d at 519, 520; *see also Harshbarger v. Regan*, 599 F.3d at 293.  This is problematic because uncorroborated hearsay could be used against an individual, but hearsay evidence alone without satisfactory corroboration can lead to erroneous conclusions.  *See, e.g.*, *United States v. Lloyd*, 566 F.3d 341, 346 (3d Cir. 2009) (internal citation omitted).

Finally, in evaluating the existence or absence of probable cause, the Court should consider the age of information relied on in a warrant.  *See United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993).  "If too old, the information is stale, and probable cause may no longer exist."  *McNeese*, 901 F.2d at 596.  In assessing staleness, the court should examine the type and age of evidence to determine reliability.  *See Harvey*, 2 F.3d at 1322.

In sum, the extradition request does not accurately identify the person before the Court, and the reliability of the evidence on which the Government bases this motion is seriously flawed, failing to establish probable cause.  The Government's extradition request should therefore be denied.

### III.    Legal Analysis

**A.    The Court Should Deny the Government's Extradition Request Because the Person Before the Court Is Not the Person Identified in the Government's Extradition Request.**

First, the Affidavit does not establish that the individual before the Court in this matter is the person whom the Canadian government is seeking.  In fact, the individual identified as Parthasarathi Kapoor in this case was born as Partha Sarathi De [hereinafter referred to as "Mr. De"] in India on December 18, 1969.  *See* Exhibit A (India Citizen Certificate).  His father was Pranab Kumar De and his mother was Dipali De.  *See* Exhibit B (Parents' Work Records)[1]; *see*

---

[1]  Several of the exhibits referenced herein are redacted with respect to certain personal information in the electronically filed copies, but the exhibits forwarded to the Court and to the government remain unredacted.

*also* Exhibit C (Parents' Identity Cards).  Additional educational records support that he was known as Partha Sarathi De throughout college and upon graduation in 1992.  *See* Exhibit D (International College Records), as well as through additional schooling in 1999.  *See* Exhibit E (Tripura Record).  He later sought political asylum in the United States in 2001 and obtained a refugee travel document as Parthasarathi De.  *See* Exhibit F (Refugee Travel Document).  He was subsequently granted political asylum and received permanent residency in 2002.  *See* Exhibit G (Consulate General of India Letter, 6/25/02, with Indian passport); *see also* Exhibit H (Permanent Resident Card).  Mr. De legally changed his name from Partha Sarathi De to Perth De in 2008, *see* Exhibit I (Order Granting Leave to Change Name), and his Indian birth certificate was subsequently changed to correct this.  *See* Exhibit J (Indian Birth Certificate, 8/26/11).  Other documents, including his Permanent Account Number (PAN) Card and a Refugee Travel Document, reflect his legal name.  *See* Exhibit K (PAN Card); Exhibit L (Refugee Travel Document).  Mr. De then became a naturalized U.S. citizen on December 8, 2010, *see* Exhibit M (Certificate of Naturalization), and thereafter received a U.S. passport and Social Security card in the name of Perth De.  *See* Exhibit N (U.S. Passport, SS Card).  The marriage certificate that Mr. De and his spouse, Ditthawat Nonghanphithak, obtained in New York in 2016, also reflects his legal name.  *See* Exhibit O (Marriage Certificate).

The Arrest Warrants name Parthasarthie Kapoor with the birthdate of December 18, 1973, *see* Dkt. Entry #9-1, at 40-41, and the Affidavit of Fact names Parthasarathi Kapoor with the birthdate of December 18, 1973, *see* Dkt. Entry #9-1, at 25, ¶ 3, yet these do not comport with Mr. De's correct legal name of Perth De or his birth name of Partha Sarathi De, nor do they comport with Mr. De's correct birthdate of December 18, 1969.  *Cf.* Ex. E-O (reflecting date of birth of 12/18/69).  And while the Affidavit lists "DE, Perth" as an alias, Perth De is his true

name, not an alias, and it is accompanied by the date of birth of "1973-12-18," which is, of course, inaccurate.  *See* Dkt. Entry #9-1, at 38.  These inaccurate identifiers in the underlying Affidavit and Arrest Warrants thus do not accurately identify Mr. De as the person who is being sought in the Government's extradition request.  The Government fails to provide the birth certificate of Parthasarathi Kapoor and, furthermore, fails to establish that Mr. De is the person identified as Parthasarathi Kapoor.[2]

That the fingerprints in the Government's Exhibit C, *see* Dkt. Entry #9-1, at 46, as obtained from Canada, matched those of the individual that the U.S. authorities had found additionally fails to support the Government's claim.  Mr. De contests that he is the person who is depicted in the fingerprint profile in Exhibit C.  The fingerprint profile in Exhibit C as obtained from Canada depicts an individual in the bottom right corner, yet this individual looks nothing like the person shown in the photographs found at Government's Exhibit B, *see* Dkt. Entry #9-1, at 44-45, nor does it look like Mr. De as shown in his certificate of naturalized U.S. citizenship.  *See* Exhibit M (Certificate of Naturalization).  Looking closely at the photograph in the fingerprint profile, the facial features of the individual pictured do not match those of Mr. De.  Specifically, the photograph in Government's Exhibit C depicts someone whose eyes have a deep inset, whereas the photographs found at Exhibit B do not show an individual whose eyes are deeply inset.  Nor does the naturalization certificate of Mr. De display eyes that are deeply inset.  Moreover, the picture in Exhibit C depicts an individual with more of a rectangular or square-shaped face, whereas the individual in Exhibit B has an oblong-shaped face.  Mr. De's naturalization certificate similarly fails to match these characteristics.  If one observes the photos

---

[2]  Significantly, the birth certificate of Parthasarathi (or Parthasarthie) Kapoor, is absent from the government submissions, as is any information regarding Mr. Kapoor's place of birth, parents' names and/or other family information that would verify the identity of the person being sought.

from Exhibit B and Exhibit C side by side, it is obvious that these photographs do not depict the same man.  The same is true when comparing Exhibit C and Mr. De's Naturalization Certificate.  While an individual's facial features may change with time or by one's own initiative, the facial features that are nearly impossible to change without serious cosmetic surgery, *i.e.*, nose, hairline, cheek bone structure, and mouth shape – are wholly inconsistent between those two exhibits.

Furthermore, the weight of the individual in Exhibit C is indicated as "60 KG" in the box labeled "Weight," and is specified as "69 kg" in the Affidavit, *see* Dkt. Entry #9-1, at 38.  First, these two weights are inconsistent with each other.  The weight of 60 kilograms equates to approximately 132 pounds, and 69 kilograms is equivalent to 152 pounds.  Further, Mr. De reports that he weighs approximately 46-47 kilograms, which contrasts sharply with 60 kilograms and 69 kilograms.  The lack of accuracy between the fingerprint profile in Exhibit C, the Affidavit, and the actual characteristics of Mr. De fails to establish that Mr. De is the correct individual being sought by Canada.  The information and photograph found on the fingerprint profile, when compared to the information Mr. De has provided, thus fails to identify that Mr. De is the person who is being sought in the Government's extradition request.

**B.      The Court Should Deny the Government's Extradition Request for Lack of Probable Cause.**

In this case, the Canadian authorities provided the Government with evidence that does not rise to the level of probable cause.  The Government relies primarily on the Affidavit of Fact of Detective Pascal Fortier, *see* Dkt. Entry #9-1, at 25-45, to set forth the evidence against Mr. Kapoor.  The Affidavit exhibits serious flaws on its face and when the specific facts presented are distilled, the evidence is not sufficient to establish probable cause to believe that Mr. Kapoor (or Mr. De) committed the alleged crimes.

### 1. The Affidavit of Detective Portier Highlights Structural Flaws that Fail to Establish Probable Cause.

With respect to the Affidavit provided, there are serious flaws that contribute to the lack of probable cause. The most notable flaw is that the Government does not provide any sworn affidavits of any persons who conducted the investigation or were interviewed in connection with the alleged offenses. Indeed, the officer who is the affiant is not the officer who had firsthand knowledge of or conducted the investigation during the timeframe of 2002 to 2003. As mentioned, the Government relies primarily on Detective Portier's Affidavit to establish probable cause for extradition. However, the document was not prepared by someone with firsthand knowledge of the underlying criminal case, as Detective Portier indicates that he "read the entire investigative file of investigators Guy Bianchi and Christine Debon who led the investigation in 2002-2003." *See* Dkt. Entry #9-1, at 25, ¶ 3. Importantly, Detective Portier does not claim that he spoke to the investigators involved in the case or in charge of the file, Guy Bianchi or Christine Debon, about the substance of the allegations against Mr. Kapoor, but only as to their availability. The Government does not give any reason why those personally involved in the case's investigation did not provide sworn affidavits or otherwise contribute to the Government's extradition request. The absence of such affidavits is particularly striking given that Detective Portier states that he contacted certain witnesses and the investigators involved in the case soon after Mr. Kapoor's arrest on January 20, 2020, and confirmed their willingness to testify. *See* Dkt. Entry #9-1, at 37, ¶ 37. The staleness of the evidence is compelling, yet there is nothing in the Affidavit, particularly in the form of sworn statements, that supports whether the alleged victims recalled these alleged facts after approximately 20 years. In addition, the Government does not offer any reports, depositions, or any other evidence that would guard against the reliability concerns of uncorroborated hearsay evidence, or the staleness of any

evidence still in existence, especially when considering that the alleged conduct occurred approximately 20 years ago.

### 2. Identification Techniques Used by the Authorities in the Investigation Are Unreliable.

As discussed above, the Government fails to establish a connection between the person being sought by Canada and Mr. De, the person who has been brought before the Court. Moreover, in this case, there are issues with the identification techniques that were utilized and relied upon that additionally fail to establish probable cause.

With respect to Mr. Kapoor, the alleged victim S.S. allegedly identified Mr. Kapoor in 3 photographs by name as "Harry." However, there is no description of the circumstances of how S.S. was shown the photographs. What can be gleaned from the Affidavit is that S.S. was shown approximately 29 photographs that were recovered from Mr. Kapoor's residence and identified Mr. Kapoor in 3 of them. *See* Dkt. Entry #9-1, at 31, ¶ 23. What those 29 photographs depicted, who they depicted, and whether Mr. Kapoor (or indeed, Mr. De) was in any of them, all of them, or only three of them, are not known. While police often attempt to place an individual at a crime scene by asking interviewees to view photographs to identify an individual, photographic evidence can be problematic. The Supreme Court has long emphasized the problems associated with photographic identification. *See Darden v. Wainwright*, 477 U.S. 168, 199 (1986) ("The use of showups has long been condemned by this Court, precisely because they can result in unreliable identifications."). Because of its inherent unreliability, police must use extreme care to ensure reliability when seeking photographic identification. Displaying a photograph of only one individual to a potential witness or victim is one of the most egregious and flagrant violations of a reliable identification procedure. *See Manson v. Brathwaite*, 432 U.S. 98, 109 (1977) ("[T]he procedure in the instant case was suggestive because only one photograph was

11

used and unnecessary because there was no emergency or exigent circumstances."). Courts normally consider that the display of a single photograph for suspect identification is so improper that it not only undermines that particular out-of-court identification, but also any future in-court identification of a suspect because the display of a single photograph is so inherently suggestive of guilt. *See id.*; *see also Darden*, 477 U.S. at 199. Also, some courts presume that a pre-trial photographic line-up is "impermissibly suggestive" where the police do not produce or preserve the photographs used to identify a suspect. *United States v. Honer*, 225 F.3d 549, 553 (5th Cir. 2000).

Here, the investigator showed S.S. approximately 29 photographs that were obtained from Mr. Kapoor's residence. S.S. allegedly identified Mr. Kapoor in three of those photographs, *see* Dkt. Entry #9-1, at 44-45, and the Affidavit further states that "S.S. recognized Kapoor and Gurpal Singh without hesitation." *See* Dkt. Entry #9-1, at 31, ¶ 23. Absent indication that photographs of other suspects were shown to S.S., such circumstances demonstrate that the display of these photographs to S.S. was impermissibly suggestive. Moreover, there is no record of what was said to S.S. during this display, which could have tainted S.S.'s response. As the Supreme Court has stated, these circumstances likely undermined the identification of Mr. Kapoor and taints any in-court identification of him as well. Given these circumstances, the display of 29 photographs obtained from Mr. Kapoor's home that was shown to S.S. was likely impermissibly suggestive and constitutes a serious flaw regarding the reliability of the information provided.

Furthermore, the Affidavit provides that after being shown 29 photographs, S.S. identified Mr. Kapoor "without hesitation" in only 3 of the 29 photographs. Yet whether Mr. Kapoor (or Mr. De) was in all, some, or only 3 of the 29 total photographs is unclear. This could

mean that S.S. failed to identify Mr. Kapoor in the other photographs, or he failed to identify Mr. Kapoor in all but 3 photographs. The fact that copies of all 29 photographs are neither included nor described does not help. The lack of description of the other photographs fails to provide proper context and points to the likelihood of a flawed identification. This flawed identification thus fails to establish probable cause in this case.

Overall, the utilization of these seriously flawed and highly suggestive identification processes in this investigation casts serious doubt on the reliability of the information presented here. This alone undermines probable cause.

### 3. Specific Facts Alleged in the Affidavit Show Fatal Defects.

The Affidavit of Detective Portier contains several factual allegations that are contradicted by Mr. De's residential history in the United States. The Affidavit also contains flaws and inconsistencies that fail to support probable cause. When reviewed in more detail, these factors weigh strongly against finding probable cause exists to extradite Mr. De in this case.

### a. Mr. De's Residency in the United States Contradicts the Timeframes of the Alleged Offenses.

The time frames of the alleged offense regarding S.S. and N.A. fail to establish probable cause that Mr. De committed the alleged offenses, given his residency in the United States during those timeframes. N.A. alleged that the abuse he experienced occurred from July 1999 to November 1999, at which point Kapoor left for the United States and returned in January 2000, calling N.A. everyday; Kapoor then left again for the United States in March 2000 and returned in April 2000, from which point until December 2000, N.A. allegedly went everyday to Kapoor's residence except on weekends. N.A. further claims that "[f]rom January 2001 to August 2001, he continued to see KAPOOR[]" until Kapoor left for the United States in August 2001. *See*

13

Dkt. Entry #9-1, at 34.  The first alleged incident with S.S. occurred on or around December 1, 2002.

Mr. De's residential history, however, places him in the United States during these critical time frames.[3]  In 2001, Mr. De was living in the United States and had sought political asylum.  From February to August 2001, Mr. De had been living in and around Sacramento, California, and in September 2001, he moved to New York City.  Indeed, Mr. De applied in March 2001 for U.S. political asylum in San Francisco, California, and had no reason to leave the United States during this time.  In fall of 2001, Mr. De began working at World Travel in New York City.  *See* Exhibit Q (Hom Decl.), at ¶ 2(a).  In 2002, Mr. De also began working at Wendy's in New York City.  *Id*.  Mr. De furthermore had a string of employment in the New Jersey area in 2002, working at Shoprite on Route 130 in Delran, NJ, Sears on Route 73 in Mt. Laurel, and Burger King on Route 73 in Mt. Laurel.  *Id*.  From 2002 to 2003, Mr. De continued working at Sears and Burger King in Mt. Laurel, New Jersey.[4]  *Id*.  In 2002, Mr. De obtained permanent residency in the United States.  During the years of 2001 to 2003, Mr. De had no reason to be in Canada and thus had no need to keep an apartment in Canada during this time.  Mr. De, moreover, had obtained in 2003 a visa to enter Canada in his legal name.[5]  N.A's and S.S.'s timeframes of alleged offenses thus appear inaccurate and inconsistent given the timeframes that Mr. De was in the United States, and the alleged abuse could not have happened

---

[3] Indeed, Mr. De has a history of lengthy employment in the United States, most recently working as a part-time Pier Agent for Intercruises Shoreside & Port Services from August 2016 until the time of his arrest.  *See* Exhibit P (Letters of Employment).
[4] Mr. De has paid taxes in the United States from 2001 through 2019, which gives additional support for his employment history.  *See* Ex. Q, at ¶ 2(b), *see also* Exhibit R (Tax & Earnings Documents).
[5] Mr. De has the visa he obtained in 2003 to enter Canada in his possessions, but due to the COVID-19 pandemic, he is unable to access it at this time.  *See* Ex. Q, at ¶ 2(c).

during the times alleged by N.A. or S.S.  The fact that N.A.'s father did not accurately report N.A.'s birthdate upon arrival to Canada, giving June 12, 1985, rather than December 31, 1986, provides further reason to find the information he gave as unreliable.

Additional factual assertions fail to establish probable cause.  For example, the alleged roommate Gurpal Singh stated that he began living as Mr. Kapoor's roommate in November 2002.  Yet again, Mr. De had obtained permanent residency in the United States well before that time in July 2002 and had no reason to be in Canada and thus no reason to rent an apartment in Canada.  With respect to the statements made by Gurpal Singh, who is also the individual connected to Raj Rani, S.S.'s grandmother, Singh claimed that Raj Rani was to help find work for Mr. De.  *See* Dkt. Entry #9-1, at 31, ¶ 22.  Yet Mr. De was already employed in the United States as of 2001, working initially at World Travel and Wendy's.  This inaccuracy regarding the dates and Mr. De's employment situation points to the unreliability of Gurpal Singh, who provided the 29 photographs from the home, as well as a photograph of himself for identification by S.S.  In addition, the location of certain photographs shown to S.S. fails to incriminate Kapoor.  In other words, 121 pornographic photographs were allegedly shown to S.S., yet these photographs were found not on Kapoor's computer, but on S.S.'s grandmother Raj Rani's computer.  *See* Dkt. Entry #9-1, at 31, ¶ 24.  Absent any other information regarding further investigation into Gurpal Singh or Raj Rani, this information fails to support that probable cause exists in this case.

> **b.  The Facts and Circumstances Alleged Against Mr. Kapoor Contain Numerous Flaws and Inconsistencies and Fail to Establish Probable Cause.**

In addition, looking at the alleged facts in the Affidavit, there are significant inconsistencies that point to uncertainty regarding the identification of Mr. Kapoor as the

15

perpetrator. The Affidavit begins with the alleged facts involved in the case of victim S.S. The Affidavit describes that S.S. had been regularly visiting the home of his grandmother, where he met an individual named "Harry" and an individual named "Kapoor." In this case, the Affidavit states that "S.S identified in photos (Exhibit B) Parthasarathi Kapoor (accused) as Harry (the bad one). In addition, S.S. identified Gurpal Singh, the accused's roommate, as Kapoor (the good one). For the sake of simplicity, and where appropriate, in this document, the first name "Harry" will be replaced by KAPOOR, the individual accused in this file." *See* Dkt. Entry #9-1, at 27, ¶ 10. The Affidavit provides that S.S. said that the person named "Harry" had shown him pornographic sites and had touched his genitals.

Significantly, there is no explanation as to why and how Mr. Kapoor should be identified as "Harry" and not "Kapoor," other than that S.S. called him "Harry." Yet S.S. identifies Mr. Kapoor's alleged roommate at the time, Gurpal Singh, as "Kapoor." The Affidavit fails to provide that Mr. Kapoor ever used the name "Harry," that he introduced himself to individuals as "Harry," or was known to others by the name of "Harry." Indeed, there is no indication of whether authorities questioned Gurpal Singh as to the inconsistency regarding their names and why he was identified by S.S. as "Kapoor." In fact, not much is made of the fact that S.S. seems to confuse the two individuals' names. There is no discussion of whether Singh was investigated as well, given his identity to S.S. as "Kapoor." Absent such an explanation, the evidence or information establishing the alleged victim's identification of Mr. Kapoor as the perpetrator is seriously flawed.

Other alleged facts involving Gurpal Singh demonstrate his lack of credibility. It is alleged that N.A. had taken videotapes from Mr. Kapoor's residence around March 2002. When Gurpal Singh told Mr. Kapoor of this, it is alleged that Mr. Kapoor quickly returned to the

United States and asked N.A. to return these belongings to him. Dkt. Entry #9-1, at 33, 28. While Gurpal Singh plays a significant role in this turn of events, Singh did not live with Mr. Kapoor until November 2002. *See* Dkt. Entry #9-1, at 31. How Singh could have been witness to N.A. retrieving the videotapes from the home at a time approximately 8 months before he arrived there is thus inexplicable. If, on the other hand, the investigator had informed Singh that N.A. handed over the videotapes to the investigator on or about January 15, 2003, and then Singh told Mr. Kapoor about this at that time, the fact that this information is being provided in this manner, subsequent to Singh's interview with investigator Guy Bianchi on January 9, 2003, is suspect, *see* Dkt. Entry #9-1, at 30, ¶ 22, though this scenario seems less likely. Overall, given the time that they were housemates, this information that Singh provides regarding central events in the investigation against Mr. Kapoor lacks credibility and demonstrates the unreliability of the information contained in the Affidavit.

Other inconsistencies regarding Mr. Kapoor point to the Government's lack of probable cause. The timeframe that R.S. provides of the alleged offenses is inconsistent with the time frames of Mr. Kapoor being in Canada. R.S. stated that he allegedly met Mr. Kapoor in 1998 when he, R.S., was living at 4702, avenue de Courtrai #43, in Montreal. *See* Dkt. Entry #9-1, at 32, ¶ 27. R.S. further alleged that during his summer vacation, in July 1998, he would go to Mr. Kapoor's residence at 4752, avenue de Courtrai, apt. #2, in Montreal, to play video games. *Id*. First, the Affidavit does not establish that Mr. Kapoor was living at that address during that time frame, as it states only that "it can be proven that KAPOOR resided at this address from October 1998 and that he left it in 2002." *See* Dkt. Entry #9-1, at 31, ¶ 25. Thus, there is no verification that Mr. Kapoor lived at 4752, avenue de Courtrai, apt. #2, as of July 1998. Moreover, the address provided in the fingerprint profile, while on the same street, is not the same address

17

given by R.S., which diminishes his credibility.  Like R.S., T.A. also alleges that the incidents with Mr. Kapoor occurred in summer of 1998, but does not give any specific dates.  However, given the information in the Affidavit, there is no evidence that Mr. Kapoor was living at the specified address as of July 1998.

Overall, the timeframes as asserted in the allegations are not only inconsistent with the timeframes that Mr. Kapoor was allegedly in Canada, but also are contradicted by the timeframes that Mr. De resided in the United States.  There are, further, flaws and inconsistencies in the Affidavit that fail to support probable cause.  This demonstrates serious flaws in the evidence used to extradite Mr. De to Canada.  Accordingly, this Court should find that the evidence is insufficient to find that probable cause exists to extradite Mr. De to Canada.

**IV.     Conclusion**

Based on the above, Mr. De submits that the available evidence fails to demonstrate that he is the person identified in the Government's extradition request and further fails to establish that probable cause exists to extradite him to Canada.  Accordingly, he requests that the Court find that extradition of Mr. De, a U.S. citizen, to Canada is improper and to deny the Government's request for extradition.  Mr. De thanks the Court for its consideration of this submission.

Respectfully submitted,

/s/Candace Hom
Assistant Federal Public Defender

cc:     Kendall Randolph, AUSA
        Perth De