UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY

In the Matter of the Extradition of   :
                                      :   Mag. No. 20-15012 (ESK)
Parthasarathi Kapoor                  :

**GOVERNMENT'S REPLY MEMORANDUM OF EXTRADITION LAW**

**I.   Introduction**

The relator before this Court is the Kapoor a/k/a De whose extradition Canada seeks. The Canadian investigation has established this through evidence including photographs, an identifying witness (victim-4), video evidence that shows the relator sexually abusing victim-1, government records, a fingerprint match, and additional corroborating evidence discussed below. The relator's additional challenges to probable cause are meritless. Canada has provided ample, competent evidence – in the form of certified, signed, sworn affidavits from the Canadian prosecutor and detective in charge of the case, summarizing the evidence against the relator – which establish probable cause to believe that he committed the offenses for which Canada seeks extradition.[1] The materials the relator proffers in an effort to contradict the Canadian submissions are inadmissible under the unique rules that govern extradition

---

[1] The government attaches hereto the Declaration of Tom Heinemann, an Attorney-Adviser in the Office of the Legal Adviser for the Department of State, dated February 24, 2021 (the "Heinemann Declaration"; **Exhibit 1** hereto), and a supplemental submission from Canada, dated January 28, 2021 (**Exhibit 2** hereto), in further support of extradition. The Heinemann Declaration attests that Canada's supplemental submission satisfies the admissibility requirements of Treaty Article Treaty Art. 10; *see also* 18 U.S.C. § 3190. Canada's supplemental submission includes a Supplementary Affidavit of Fact from Detective Pascal Fortier.

proceedings, and in any event, probable cause remains intact. He does not dispute that the remaining elements for the Court to certify extraditability to the Secretary of State are satisfied. The Court should therefore certify extraditability to the Secretary of State, who will then decide whether to surrender the fugitive to Canada "according to the treaty." *Id.*

II. **Argument**[2]

   A. **The Person Before the Court is the Person Whose Extradition Canada Seeks**

At the extradition hearing, the Court must conclude that probable cause exists to believe that the person before the Court committed the crimes Canada alleges occurred. *See Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006); *Sidali v. I.N.S.*, 107 F.3d 191, 199 (3d Cir. 1997) ("[T]he probable cause standard applicable in extradition proceedings is identical to that used by courts in federal preliminary hearings."). Canada's submissions establish, in multiple ways, that the person before this Court is the Kapoor a/k/a De whose extradition Canada seeks.

First, Victim-4 identified the photographs in Exhibit B to Canada's request (DE 9-1 at 44-45 ("Canada's Exhibit B")) as depicting his attacker. These photographs depict the same individual who stands before this Court, who also appears in photographs associated with a 2010 U.S. passport in the relator's

---

[2] The facts in this matter, as certified by the Director of Criminal and Penal Prosecutions of Quebec, can be found in Exhibit 2 of the Government's opening brief, at KAPOOR Request-5-20.

admittedly adopted U.S. name of "Perth De" (Ex. 2 at 12); a 1997 driver's license that issued in Calcutta, India, to "Partha S Kapoor" (*id.* at 18);[3] 1998 immigration paperwork from the Canada Border Services Agency for "Parthasarathi Kapoor" (date of birth December 18, 1973) with an address on avenue de Courtrai in Montreal (*id.* at 8; *also available at* DE 9-1 at 46 ("Canada's Exhibit C"); and a color, passport-type photograph that Canadian authorities discovered during their investigation with the signature "Partha Sarathi Kapoor" and "D.O.B. 18.12.73" written next to it" (*id.* at 24). The latter three documents bear the same signature. (*See* Ex. 2 at 3 ¶ 8; 6 ¶ 19.) Additionally, for ease of reference, Canada has provided a side-by-side photo comparison, which demonstrates that Canada's Exhibit B, Canada's Exhibit C, the aforementioned color passport-type photo, and the relator's booking photo from his January 2020 arrest in the instant matter all depict the same person. (*See id.* at 6 ¶ 20; 26 ("Photo Comparison").)

Second, Canada's submissions establish that the fingerprints associated with Canada's Exhibit C match the relator's booking fingerprints from his January 20, 2020, arrest in the instant matter. (*See* Ex. 2 at 3 ¶ 6; 8; 10.) In the face of both the visual match and the fingerprint match, the relator's

---

[3] Canada's submissions reflect that the Canadian government obtained three documents with an Indian address for Kapoor in Calcutta. (See Ex. 2 at 16-20.) These include an Identity Card from the Election Commission of India for "Kapoor Partha" which lists his father's name as "Pranab Kumar" (*id.* at 3 ¶ 8; 19). The relator previously asserted to this Court that Pranab Kumar is his father's name. (*See* Fug. Br. at 6).

3

suggestion that Exhibits B and C pertain to two different people is meritless. Moreover, the photographs in these exhibits consistently depict an individual with protruding ears, a high forehead, slightly high cheekbones, a wide neck, and a wide/prominent Adam's apple. (*See* Ex. 2 at 6 ¶ 20; Photo Comparison).[4]

Third, Canada's evidence includes video recordings of the relator sexually abusing victim-1. In particular, "videotape #8," which Detective Bianchi obtained in 2003 from one of "Kapoor's" former roommates, Saleh Kaoser, begins with a recording of various photographic immigration documents for "Parthasarathi Kapoor," as well as his Quebec health insurance number, "KAPP73121815." (Ex. 2 at 4 ¶ 9.) The Canadian submissions explain that "KAPP" refers to the first three letters of the person's surname, followed by the first letter of their first name, and "73121815 refers to their date of birth (YY-MM-DD) and two random numbers (in this case (73-12-18). (*Id.*) Detective Bianchi is prepared to testify that the tape then depicts the same individual engaging in sex acts with victim-1. Specifically, a recording of unknown date depicts victim-1 shaving his anus and the relator performing oral sex on him; a recording dated December 8, 2000, depicts victim-1 (age 13 years, 11 months) masturbating and the relator performing oral sex on him; a recording dated November 9, 2001, the relator and victim-1 (age 14 years, 10 months) kissing,

---

[4] The relator's assertion that he currently weighs less than the 60 kg the 1998 Canadian immigration document lists is immaterial. Even assuming the listed weight was accurate in 1998, a change in weight over the ensuing 22+ years is entirely plausible.

and a cell phone given; and a recording dated September 26, 2001, depicts victim-1 (age 14 years, 8 months) undressing and masturbating, and the relator performing and receiving oral sex with him. (DE 9-1 at 36 ¶ 35-36.)[5]

Moreover, while this is not necessary to establish identity, Canada provides corroborating proof of the relator's residence in Montreal during the relevant period. For ease of reference: Victim-1 told police that he met Kapoor in front of his residence, 4752 avenue de Courtrai, in the summer of 1998; that his encounters with Kapoor between July 1999 and approximately April 2002 occurred on avenue de Courtrai; and that he had a key to Kapoor's apartment. (DE 9-1 at 31 ¶ 25.) Both Victim-1 and Victim-1's friend corroborated that they returned to Kapoor's apartment in the spring of 2002 to retrieve videos Kapoor kept of Victim-1 engaging in sex acts, and that Kapoor attacked Victim-1 at that

---

[5] The relator cites no legal support for his suggestion that Canada must provide a copy of an Indian birth certificate for "Parthasarathi Kapoor." On the contrary, the Treaty lists the information Canada must provide to support an extradition request, which includes "a description of the person sought," Treaty art. 9(2), but does not include any specific identification documents, let alone a birth certificate from a third country. *See Noeller v. Wojdylo*, 922 F.3d 797, 803 (7th Cir. 2019) ("Extradition treaties 'should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them'") (quoting *Factor v. Laubenheimer*, 290 U.S. 276, 293 (1933)); *United States v. Trabelsi*, 845 F.3d 1181, 1191 (D.C. Cir. 2017) ("[C]ourts should be especially reluctant to read conditions into a treaty that would render extradition more difficult.") (citation omitted); *Simeonov v. Wojdylo*, No. 19CV 05062, 2019 WL 4694942, at *5 (N.D. Ill. Sept. 26, 2019) (finding that "the Treaty contains no requirement" to provide information fugitive asserted was lacking), *appeal dismissed as moot*, No. 19-2910, 2019 WL 8327895 (7th Cir. Dec. 12, 2019); *see also Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (*en banc*) (stating "default rule" that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition").

5

same location in the spring of 2002 as a result. Victim-1 provided these videos to Canadian police. Victim-2 told police that during the summer of 1998, "Kapor"/"Kapour" sexually abused him and resided at 4752 avenue de Courtrai apt. #2 (*id.* at 32 ¶ 27), which was near victim-2's home on the same avenue. (Ex. 2 at 5 ¶ 18). Victim-3 told police that during the summer of 1998, Kapoor lived in "apartment #1 or #2," near victim-3's home address, which was also on avenue de Courtrai. (Ex. 2 at 4-5 ¶ 13.) Victim-4 told police that on January 3, 2003, the person Canada's Exhibit B depicts (whom he knew as "Harry") sexually abused him at victim-4's grandmother's home. Victim-4's grandmother stated that victim-4 knew Kapoor as "Harry" and provided Kapoor's phone number, which was registered to Gurpal Singh at 555 Marcel Laurin #102, Ville-St-Laurent.

Canada's submissions corroborate that (1) in August 1998, the relator provided Canadian immigration authorities with an address on avenue de Courtrai (the form lists 4652 avenue de Courtrai, Montreal) (Canada's Exhibit C); (2) on October 23, 1998, Quebec's automobile licensing authority (the Societe de l'assurance automobile du Quebec) opened a file for the same Parthasarathi Kapoor (date of birth December 18, 1973), with an address on file of 4752 avenue de Courtrai, apt. #2, Montreal. (Ex. 2 at 4 ¶ 11; DE 9-1 at 31 ¶ 25); (3) in August 2001, in connection with a separate matter that did not result in criminal charges, Canadian law enforcement encountered the same Kapoor at his address, 4752 avenue de Courtrai #2, and identified him with his health

6

insurance card and social insurance number (DE 9-1 at 31 ¶ 25); (4) according to Canadian immigration authorities, on October 17, 2002, Kapoor received permanent resident status in Canada (*id.* at 30 ¶ 19); (5) in January 2003, Canadian immigration authorities informed Canadian police that Kapoor had given 555 boul. Marcel Laurin, apt. #102, Ville St-Laurent, as his updated address (*id.* at 30 ¶ 19); (6) in January 2003, Canadian police searched this address on boul. Marcel Laurin and found evidence of rental occupancy from the Canadian passport office, dated January 8, 2001, in the name of Parthasarathi Kapoor and addressed to the previous apartment on avenue de Courtrai, as well as proof of rental occupancy in the name Parthasarathi Kapoor from several financial institutions (*id.* at 30 ¶ 21); (7) among the documents seized at the boul. Marcel Laurin address was a confirmation of employment dated July 22, 2002, signed by Saleh Kaoser, indicating that "Partha Sarathi Kapoor" had worked full time at Kapoor Garments, located at 4375 Ave de Courtrai in Montreal, for the previous seven years, earning 4000 Canadian dollars per month (Ex. 2 at 22); and (8) Gurpal Singh, who identified Kapoor photographically, told Canadian authorities that in November 2002, he became Kapoor's roommate at boul. Marcel-Laurin (*id.* at 31 ¶ 25).

    For all these reasons, more than ample proof exists that the person before the Court is the person whose extradition Canada seeks.

    **B. Canada's Submissions Satisfy the Probable Cause Requirement**

    **1. Canada Provides Competent Evidence that Establishes Probable Cause**

7

The law is clear that because an extradition hearing is not a criminal proceeding, unique rules apply, and hearsay is admissible. (*See* Gov. Mem. Extradition Law ("Gov. Br."), DE 9 at 20-27 (citing cases).) Additionally, the material in the requesting country's submissions should be taken as true. *See* Gov. Br. at 23 (citing cases); *In re Extradition of Cheung*, 968 F. Supp. 791, 794 n.6 (D. Conn. 1997) (stating that court "'must accept as true all of the statements and offers of proof by the demanding state,' even if they contain hearsay") (quoting *In re Extradition of Marzook*, 924 F. Supp. 565, 592 (S.D.N.Y. 1996)).

Contrary to the relator's suggestion, neither the Treaty nor federal law indicates that evidence submitted in support of an extradition request should be sworn under oath. *See* Treaty art. 10(1) (requiring a pre-prosecution extradition request to be supported by evidence "sufficient, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused had been committed in its territory").[6] The Supreme Court previously has addressed this precise issue, holding that such language in treaties does not require that a requesting state provide evidence in the same form as it typically would be provided in U.S. courts, and that unsworn statements are acceptable in extradition proceedings:

---

[6] *See also* Treaty art. 10(2) (providing that "[t]he documentary evidence" from Canada "or copies of these documents shall be admitted in evidence" when "they are authenticated by an officer of the Department of Justice of Canada and are certified by the principal diplomatic or consular officer of the United States in Canada").

8

> The phrase 'such evidence of criminality,' as used in the treaty, refers to the scope of the evidence or its sufficiency to block out those elements essential to a conviction. It does not refer to the character of specific instruments of evidence or to the rules governing admissibility. Thus, unsworn statements of absent witnesses may be acted upon by the committing magistrate, although they could not have been received by him under the law of the state on a preliminary examination.

*Collins v. Loisel*, 259 U.S. 309, 317 (1992) (emphasis added); *see also Manta v. Chertoff*, 518 F. 3d 1134, 1147 (9th Cir. 2008) ("[O]ur well-established case law [establishes] that evidence offered for extradition purposes need not be made under oath."); *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1163 & 1166 (11th Cir. 2005) (upholding probable cause determination based on unsworn 106-page bill of indictment prepared by a foreign investigator).

Further, extradition courts routinely rely on a requesting state's summary of its evidence. *Bovio v. United States*, 989 F.2d 255, 259-61 (7th Cir. 1993) (upholding probable cause determination based on investigator's statement); *Zanzanian v. United States*, 729 F.2d 624, 627-28 (9th Cir. 1984) (finding police report describing witness statements competent evidence); *In re Extradition of Silva-Peralta*, No. 15-MJ-3444-WVG, 2016 WL 4987483, at *6 (S.D. Cal. Sept. 19, 2016) ("The Supreme Court has held that extradition may be predicated entirely on the 'unsworn statements of absent witnesses.'") (quoting *Collins*, 259 U.S. at 317); *Jean v. Mattos*, No. CIV. 13-5346 KSH, 2014 WL 885058, at *4 (D.N.J. Mar. 5, 2014) ("That some evidence is 'alluded to' rather than

9

'reproduced' – for example, the police reports from which witness statements were presumably extracted are not in the record – does not diminish the validity of what is satisfactorily described."); *In re Extradition of Jarosz*, 800 F. Supp. 2d 935, 947-48 (N.D. Ill. 2011) ("So long as the exhibits submitted by the requesting nation are certified and authenticated in accordance with the relevant statute, the evidence may come from a prosecutorial report.").

In fact, extradition courts repeatedly have rejected fugitives' challenges to the reliability of multiple hearsay. *See, e.g.*, *Escobedo v. United States*, 623 F.2d 1098, 1102 n.10 & 1103 (5th Cir. 1980) (upholding extradition magistrate's finding of probable cause, and rejecting fugitive's assertion that evidence requesting state submitted "constitutes compound hearsay and is untrustworthy"); *Marzook*, 924 F. Supp. at 592 (finding probable cause that fugitive committed crimes abroad despite claim that extradition complaint was based "purely upon multiple hearsay"); *In re Extradition of Chan Hon-Ming*, No. 06-M-296(RLM), 2006 WL 3518239, at *8 (E.D.N.Y. Dec. 6 2006 (noting that "[i]t is well established that hearsay evidence, including multiple hearsay and the unsworn statements of absent witnesses, is admissible at extradition hearings and may support a finding of extraditability"); *Jarosz*, 800 F. Supp. 2d at 947 n. 4 ("In extradition cases, the hearsay exists on at least two levels. First, is the statement of the absent declarant who prepared and submits the witness summaries. The second level is comprised of the hearsay statements of the witnesses to the prosecutor or police officer. There can even be three or more

10

levels of hearsay. For example, a witness may recount statements made by another witness, which are then recounted to the declarant who prepares the summaries used in the extradition hearing.").

Here, Canada has exceeded its Treaty obligations and provided ample competent evidence to support a probable cause finding, through the certified, signed, and sworn affidavits of Prosecutor Marie-Josee Harvey and Detective Pascal Fortier. (*See* DE 9-1; Exhibit 2 hereto). While the relator faults Detective Fortier's affidavit because Detective Fortier does not assert that he personally has been involved in the Canadian investigation since 2002-2003, this is a red herring. Detective Fortier attests under oath, in both of his affidavits, that he is currently in charge of the investigation concerning the charges against Kapoor and that he has read the entire case file of investigators Guy Bianchi and Christine Debon, who led the investigation in 2002-2003. (DE 9-1 at 25 ¶ 3; Ex. 2 at 3 ¶ 3). More importantly, Detective Fortier summarizes the evidence against the relator and attributes each factual assertion in his summary to a source in the file. For example, Detective Fortier's summary cites evidence including (1) statements from victim-4, including a video-recorded interview with Detective Bianchi (*id.* at 27-28 ¶¶ 9-12; Ex. 2 at 5 ¶¶ 16, 18); statements from victim-4's father, stepmother, and grandmother (*id.* at 28-29 ¶¶ 13-14, 16; Ex. 2 at 5 ¶ 17); victim-2 (*id.* at 32 ¶¶ 26-27); statements from victim-1, including a video-recorded interview with Detective Debon (*id.* at 33-35 ¶¶ 28-31; Ex. 2 at 4 ¶ 12); statements from victim-1's friend Nadeem Akbar (*id.* at 33 ¶ 28 & 35 ¶ 32);

11

victim-3, including a video-recorded interview with Detective Debon (*id.* at 35-36 ¶¶ 33-34; Ex. 2 at 4-5 ¶ 13); and statements from one of the relator's former roommates, Saleh Kaoser; (2) video recordings that the relator left with Kaoser in April 2003 before leaving for Brampton, Ontario, which include footage of the relator sexually abusing victim-1 (*id.* at 36-37 ¶¶ 35-36); and (3) corroborating proof of the relator's residence and employment in Canada during the relevant period (DE 9-1 at 29-36 ¶¶ 18-19, 21-22, 25, 28, 35; Canada's Exhibit C; Ex. 2 at 4-5 ¶¶ 10-15, 18; 8; 22). In any event, Detective Fortier expressly states that that victims 1 through 4, as well as Detectives Bianchi and Debon, are all available to testify against Kapoor at trial. (*Id.* at 37 ¶ 37.)

Accordingly, the Court can and should rely on Detective Fortier's affidavits in making its probable cause determination.

### 2. The Relator's Challenges to Probable Cause are Meritless

#### a. The Photo Identification by Victim-4 Is Competent Proof of Identity

Citing no authority in the extradition context, the relator speculates that the proceedings in which victim-4 identified the photographs in Canada's Exhibit B as depicting him must have been suggestive because Canada's initial submissions indicate that police presented victim-4 with 29 photographs. This claim is factually and legally incorrect. Detective Fortier's supplemental affidavit explains that Canadian investigators showed victim-4 twenty-nine photographs of *different* people (men women and children. (*See* Ex. 2 at 5 ¶ 16.) Only three of these photographs depicted Kapoor, and victim-4 correctly identified all three. (*See id.*)

12

Regardless, suppression rules do not apply in extradition proceedings. Rules forbidding certain kinds of identifications as potentially unreliable serve to safeguard a beyond-a-reasonable-doubt standard that does not apply in extraditions. The relator cites no case requiring a particular identification procedure as a prerequisite to a probable cause finding in extradition proceedings. *See Quinn v. Robinson,* 783 F.2d 776, 815 (9th Cir. 1986) ("although the magistrate may take the circumstances of an identification into account in assessing its reliability, there is no per se rule that specifies which identification procedures are 'competent' for probable cause purposes"); *see also Manta v. Chertoff*, 518 F.3d 1134, 1145 (9th Cir. 2008) (approving of court's reliance on identification using a single photograph eight years after crime occurred); *see Escobedo v. United States*, 623 F.2d 1098, 1102 (5th Cir. 1980) (affirming denial of habeas petitions, where extradition submission from Mexico contained report of Cuban official's deposition identifying a photo of the fugitive as one of the persons who performed attack).

Here, moreover, it is especially appropriate to deem the identification from victim-4 competent, as the circumstances of the identification do not suggest any likelihood of misidentification. Victim-4 identified three photographs of his attacker, and had a foundation to recognize his attacker because he met his attacker on multiple occasions beginning in December 2002 and continuing into January 2003. (DE 9-1 at 27 ¶¶ 9-10.) Victim-4 also was able to describe these encounters in detail, including that the relator, whom he knew as "Harry," was the "bad" one who touched him in specific ways, showed him pornography, and told him to dance. (Victim-4's grandmother corroborates that victim-4 knew Kapoor as "Harry.") Second, victim-4 identified the photographs in close

13

temporal proximity to the events in question, on January 10, 2003, within one week of the alleged sexual abuse. (*See id.*)

Further, as discussed *supra* (Part II(A)), Canada has provided additional competent evidence of identity through the relator's fingerprints and video evidence of him sexually abusing victim-1 (not to mention corroborating proof of residence in Montreal during the relevant periods). Under these circumstances, the multiple identifications of the relator are competent evidence supporting probable cause for extradition purposes.

### b. The Material the Relator Proffers to Contradict Canada's Submissions is Inadmissible In Extradition Proceedings and, In Any Event, Does Not Disrupt Probable Cause

As the government noted in its opening brief, due to the nature and limited purpose of an extradition hearing under 18 U.S.C. § 3184, a fugitive may not introduce evidence that contradicts the requesting state's proof or poses a conflict of credibility; rather, the only evidence a fugitive may introduce is evidence that explains the requesting state's proof. *See* DE 9 ("Gov. Br." at 25-26) (citing cases); *see, e.g., Collins*, 259 U.S. at 316 (stating that permitting the introduction of defense evidence "would be in plain contravention of the intent and meaning of the extradition treaties") (internal quotation marks and citation omitted); *Hoxha*, 465 F.3d at 561 ("Courts have traditionally distinguished between inadmissible 'contradictory evidence,' which merely conflicts with the government's evidence, and admissible 'explanatory evidence,' which entirely eliminates probable cause."); *Ordinola v. Hackman*, 478 F.3d 588, 608 (4th Cir.),

14

*cert. denied*, 128 S. Ct. 373 (2007).  *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984); *United States ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963).  This is because credibility determinations are reserved for the foreign court, rather than the U.S. extradition court.  *See, e.g., See Santos v. Thomas*, 830 F.3d 1002-03 (9th Cir. 2016) (*en banc*) (stating that evidence that poses a "conflict of credibility" is inadmissible in extradition proceedings); *Bovio*, 989 F.2d at 259; *In re Singh*, 124 F.R.D. 571, 573 (D.N.J. 1987) ("While the accused may produce evidence to explain matters, the court may exclude evidence which merely contradicts government testimony, poses conflicts of credibility or establishes a defense.").

This accords with the principle that because an extradition hearing is not a trial, the country requesting extradition is not obligated to send all of its evidence to the United States or to rehearse its case before a United States court. *See Collins*, 259 U.S. at 316; *see also Singh*, 124 F.R.D. at 579 (stating that extradition proceedings should not be a "dress rehearsal trial"); *In re Extradition of Jean*, Mag. No. 13-3588 (MF), 2013 WL 4502102, at *4 (D.N.J. Aug. 22, 2013). "[T]he foreign government is not required to present its entire case in this country. The evidence presented need only 'support a reasonable belief that [the fugitive] was guilty of the crime[s] charged.'" *Austin v. Healey*, 5 F.3d 589, 605 (2d Cir.1993), *cert. denied*, 510 U.S. 1165 (1994).  Likewise, the material that the requesting country does send is to be taken as true.  *See, e.g., In re Solis*, 402 F. Supp. 2d 1128, 1131 (C.D. Cal. 2005); *In re Lukes*, No. 2:02-MC-23-FTM,

15

2003 WL 23892681, at *4 n.6 (M.D. Fla. May 8, 2003); *In re Extradition of Cheung*, 968 F. Supp. 791, 794 n.6 (D. Conn. 1997) (stating that the court "'must accept as true all of the statements and offers of proof by the demanding state,' even if they contain hearsay.") (quoting *Marzook*, 924 F. Supp. at 592 (alteration omitted)); *Desautels v. United States*, 782 F. Supp. 942, 944 n.2 (D. Vt. 1991); *Ahmad v. Wigen*, 726 F. Supp. 389, 399–400 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990); *In re Extradition of Atta*, 706 F. Supp. 1032, 1050–51 (E.D.N.Y. 1989) ("The primary source of evidence for the probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for the purposes of this determination.") (citing *Collins*, 259 U.S. at 315-16).

Moreover, extradition courts routinely reject technical and affirmative defenses in extradition proceedings, including attempts to establish an alibi. *See* Gov. Br. at 26; *see, e.g.*, *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978); *In re Extradition of Czerech*, No. MAG 19-6763, 2020 WL 603998, at *4 (D.N.J. Feb. 6, 2020) (stating that a fugitive may not attempt to establish an alibi) (citing *Shapiro v. Ferrandina*, 478 F.2d 894, 901 (2d Cir. 1973)); *In re Extradition of Okeke*, No. 96-7019P-01, 1996 WL 622213, at *4 (D.N.J. Sept. 5, 1996) (excluding fugitive's proffered evidence that he was delivering packages in New Jersey for his employer, finding that "the proffered evidence of alibi directly contradicts [witness]'s statement that she met with and received drugs from him in Rio de Janeiro and thus is not 'explanatory'") (citation omitted); *In Re Luna*,

16

No. 16-xr-90095, 2017 WL 1036732, at *3 (N.D. Cal. Mar. 17, 2017).  *In Re Pineda Lara*, No. 97 CR. MISC. 1, 1998 WL 67656, at *9 n.6 (S.D.N.Y. Feb. 18, 1998); *United States v. Amailable*, No. 14 M 1043, 2015 WL 4478466, at *8 (E.D.N.Y. July 16, 2015) ("in challenging an extradition request, the extraditee may not present evidence . . . to establish an alibi").

Here, the relator has proffered exhibits to contradict Canada's proof that he is the person who sexually abused the victims in Montreal during the relevant periods.  (*See* Fug. Br. at 13 (asserting that "Mr. De's" purported "[r]esidency" in the United States "Contradicts the Timeframes of the Alleged Offenses").)  His proffered materials ostensibly suggest that in 2001, "Parthasarathi De," with a purported home address in Sacramento, California, may have reported an adjusted gross income of approximately $6,500 to the federal government for tax year 2000; that in November 2001, "Parthasarathi De," purportedly born in India, obtained a U.S. refugee travel document; that in 2002, "Parthasarathi De," with a purported home address in Corona, New York, may have reported an adjusted gross income of approximately $8,500 to the federal government for tax year 2001; that "Perth De" has been a U.S. permanent resident since March 2005; that in August 2008, "Partha Sarathi De" changed his name to "Perth De" in New York; that in March 2009, "Perth De" obtained a U.S. travel document; that in December 2010, "Perth De" obtained a Certificate of Naturalization in New York and a U.S. passport; that in August 2016 (more than 13 years after the relator allegedly assaulted victim-4), Intercruises Shoreside & Port Services

17

hired "Perth De"; and that in August 2018, SMS International Shore Operations hired "Perth De."

Inasmuch as the relator proffers this material to contradict Canada's submissions establishing that he is the person Canada seeks, this material is inadmissible in extradition proceedings. As the above-cited case law reflects, Canada's evidence is to be taken as true for purposes of an extradition hearing, and credibility determinations, along with any affirmative defenses the relator may wish to raise, are for the foreign court. Regardless, even if the Court were to admit the material the relator proffers, it leaves probable cause untouched. While the material appears to confirm that the relator has operated under multiple identities, his using those multiple identities does not actually make the relator a different person. And while the relator may have filed U.S. tax returns beginning in 2001 claiming to have earned very modest income in 2000, this has no bearing on whether, in Montreal (which is fewer than fifty miles from the Canadian border with New York state), he sexually abused victims 2 and 3 in 1998, victim 1 beginning in 1999, or victim-4 in January 2003. Further, Canada's submissions have included witness and victim statements related to the relator's frequent travel between Canada and the United States between the time period of 1998 and 2003. Accordingly, probable cause remains.

## III. CONCLUSION

For the foregoing reasons, the government respectfully requests the certification of Kapoor's extraditability to Canada for the offenses of sexual interference, invitation to sexual touching, sexual assault, sexual exploitation, assault, obtaining sexual service of a person under 18 years old, making child pornography, and possession of child pornography.

Dated: March 1, 2021          Respectfully submitted,

                 RACHAEL A. HONIG
                 Acting United States Attorney

BY: _____
                 KENDALL RANDOLPH
                 Special Assistant U.S. Attorney